# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 16, 2017              Decided July 3, 2018

No. 16-3078

UNITED STATES OF AMERICA,
APPELLEE

v.

FRANKLIN JOVANY TORRES,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cr-00135-1)

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Tony Axam, Jr.*, and *Beverly Gay Dyer*, Assistant Federal Public Defenders, entered appearances.

*Valinda Jones*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* WILLIAMS.

PILLARD, *Circuit Judge*: J.A., a teenage boy, testified at trial that Defendant-Appellant Franklin Torres, an adult twice his age, had anal sex with him, and that during the same encounter Torres used his cell phone to take four photographs of J.A.'s erect penis while J.A. was lying on his back alone on his parents' bed, naked, with his hands covering his face. Torres posted one of the photos to Facebook, and all four were later discovered on Torres's phone. The jury convicted Torres under District of Columbia law of sexually abusing a minor, and under federal law of producing, possessing, and distributing child pornography.

Torres appeals his convictions of producing child pornography based on the photos of J.A.'s exposed genitals, and of sexual abuse based on the anal intercourse with J.A. He challenges his child pornography conviction because, in his view, no jury could reasonably conclude that he induced J.A. to engage in "sexually explicit conduct"—which, under the statute, includes "lascivious exhibition of the genitals," 18 U.S.C. § 2256(2)(A)(v)—specifically "for the purpose of producing" the photos, *id.* § 2251(a). He also challenges the sex-abuse conviction because, he contends, the government impermissibly elicited crucial testimony with a leading question.

We hold that the jury heard sufficient evidence from which to infer that Torres induced J.A.'s lascivious exhibition of his genitals in order to photograph it, including evidence that Torres held J.A.'s penis toward the phone's camera in taking one of the pictures, as well as evidence that he lied to J.A. that he had deleted the photos when he in fact retained them for later

use. As to the form of the government's questions, we hold that the district court had discretion to let the government ask J.A., a very reticent witness, to clarify the nature of his sexual contact with Torres in the manner that it did. We thus affirm both convictions.

I.

The crimes of which Torres was convicted took place while he shared a one-bedroom apartment with his childhood friend Andrea, her husband, and their five children—including J.A., then sixteen years old. (To protect J.A.'s privacy, we use his initials and omit his mother's surname.) J.A.'s parents agreed to let Torres move in with the family in January 2014, during a period when Torres was unemployed and struggling to afford a place to live. Torres was in his early thirties.

In August or September of 2014, Torres posted a photo to Facebook, where Andrea caught a glimpse of it. The picture showed a naked teenage boy with his erect penis prominently displayed. Andrea did not at first recognize the boy, who was shielding his face with his arm. Andrea confronted Torres about the post. According to Andrea, Torres got "very nervous," said that the boy in the photo was his "boyfriend," and explained that he was "drunk" and "mad" when he posted it. Transcript of Trial at 96, 98, *United States v. Torres*, No. 15-1345 (D.D.C. Mar. 8, 2016) (3/8/16 Tr.). Torres expressed concern that J.A.'s father might have seen the photo and, if so, would think the "boyfriend" was J.A.

Andrea, troubled by the episode, set out to investigate the contents of Torres's cell phone. Finding it password-protected, she surreptitiously removed its memory card and downloaded the contents to the family computer. She later hunted through the many images she found, eventually locating the photo she had seen on Facebook. Upon closer inspection, she realized

that the photo was taken on her bed, and that the young man in the picture was J.A. She also found three other nude pictures of J.A. on the phone, evidently taken during the same afternoon. All four photos, taken from a vantage point near J.A.'s knees, looking up along his outstretched body, depict J.A. lying back on the bed covering his face with his arm, with his genitals prominently displayed. In one photo, the most zoomed-in of the four, Torres's hand can be seen reaching forward from outside the frame, placing his fingers behind the shaft of J.A.'s penis to tilt it toward the camera.

Andrea again confronted Torres. He begged for forgiveness, saying he was drunk when he took the pictures, and claimed that J.A. had initiated the sexual encounter. Torres moved out of the apartment, after which Andrea showed J.A.'s father the photos she had found. Together, they asked J.A. about the photos, and what happened between him and Torres. In response, J.A. wept and was only able to say "[n]o, no, no." *Id.* at 125-26. J.A.'s parents then took the photos to the police, who interviewed J.A. and seized the phone and the family computer. A forensic analysis of Torres's phone, and of the image files, corroborated Andrea's account of finding the photos on Torres's phone.

Torres was arrested and charged with production, possession, and distribution of child pornography, in violation of federal law. *See* 18 U.S.C. §§ 2251(a), 2252(a)(2). He was also charged, under District of Columbia law, with first degree sexual abuse of a minor. *See* D.C. Code § 22-3009.01.[1]

---

[1] The government initially charged two counts of sexual abuse, apparently intending one allegation of anal-genital contact and one allegation of oral-genital contact, but the indictment inadvertently duplicated the count charging anal sex and omitted the oral sex count.

At trial, J.A.'s parents testified about finding the images on the memory card of Torres's phone, and a digital evidence recovery specialist who later analyzed the images described his findings. The government introduced all four photos in evidence.

J.A. testified, through a translator because Spanish is his primary language, as the government's last trial witness. J.A. reviewed the four photos, described for the jury what was going on in them, and recounted how Torres took them. He said Torres took all four photos in quick succession, with his phone, and that Torres was fully clothed at the time. J.A. testified that he did not want to be photographed and that he had asked Torres to delete the pictures, to which Torres replied—falsely—that he already had.

J.A. next testified about "what happened right before [Torres] took those pictures," Transcript of Trial at 104, *United States v. Torres*, No. 15-1345 (D.D.C. Mar. 9, 2016) (3/9/16 Tr.), describing the following sequence of events: He and Torres were alone in the living room watching television when Torres rested his hand on J.A.'s thigh. Torres then went into the bedroom, telling J.A. that he wanted to show him something. J.A. followed, and once they were in the bedroom Torres removed J.A.'s clothes, over resistance from J.A. J.A. recalled feeling "bad" and "uncomfortable" at that point. *Id.* at 109. When the prosecutor then asked J.A. to describe what Torres did next, J.A. did not respond, and the district judge called a ten-minute recess—apparently to allow J.A. to compose himself.

After the recess, the government commenced a line of questioning geared toward determining whether and how Torres "touch[ed]" J.A. once he was naked. *Id.* at 110. J.A. testified that Torres's hand touched his penis while they were

both standing, and that after Torres told J.A. to lie down on the bed, Torres's "back part" also touched his penis. *Id.* at 111. Then the following exchange occurred:

> Q. Okay. And when you say "his back part," what do you mean?
>
> A. (No response.)
>
> Q. [J.A.], do you know another name for [Torres]'s back part?
>
> A. (No response.)
>
> Q. [J.A.], can I have you look up at me? Can you tell me another name for [Torres]'s back part?
>
> A. (Through the Interpreter) His butt.
>
> Q. [J.A.], did your penis go inside of [Torres]'s butt?
>
> A. (Through the Interpreter) Yes.

*Id.* at 111-12. Defense counsel did not object to those questions, but objected unsuccessfully when J.A. next testified in a similar fashion that Torres performed oral sex on him. *Id.* at 112-13.[2] After the prosecutor asked which of the two forms of penetration occurred first, defense counsel asked for a sidebar, during which he moved for a mistrial on the ground that the Government had asked the "ultimate question" in a "yes or no" form. *Id.* at 113-14. The district court responded

---

[2] The testimony about oral sex would have been relevant to the second sexual abuse count, which the parties still assumed was properly charged when J.A. was on the stand. The court and parties discovered the error a short time later, at which point the government dismissed the second count.

that, in light of the subject matter, J.A.'s age, and his reticence, the government should have "some leeway" to ask "leading" questions. *Id.* at 113. The court declined to grant a mistrial.

J.A.'s testimony was the only description of the encounter that the jury heard. Torres, testifying in his own defense, denied ever having sex with J.A. or taking any of the pictures.

At the close of the government's evidence, and again at the end of trial, Torres moved for acquittal on the charge of producing child pornography, claiming that the government had offered no evidence that Torres was "motivated by the intent to photograph" J.A., and that the pictures were only "incidental" and "collateral" to the sexual intercourse. *Id.* at 121-22; *see* Transcript of Trial at 84, 157-58, *United States v. Torres*, No. 15-1345 (D.D.C. Mar. 10, 2016) (3/10/16 Tr.). The district court denied the motions. 3/9/16 Tr. 126, 128; 3/10/16 Tr. 84, 157-58. Later, instructing the jury on the production count, the court cautioned that "[i]t is not enough for the Government to simply show that the defendant took the photographs on purpose," but that "the Government must show beyond a reasonable doubt that defendant's actions were motivated by the intent of producing child pornography." 3/10/16 Tr. 99.

The court also instructed that to convict the defendant of production of child pornography the jury would have to find the defendant "did employ, use, persuade, induce, entice or coerce the victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," *id.* at 95, and that "lascivious exhibition of the genitals or pubic area of any person" meets the statute's definition of sexually explicit conduct, *id.* at 97. The court further explained that "lascivious exhibition means indecent exposure of the genitals

or pubic area, usually to incite lust," and that "[n]ot every exposure is a lascivious exhibition." *Id.*[3]

---

[3] In defining genital or pubic exposure that could constitute a "lascivious exhibition" within the meaning of the statute, the court further specified:

> The fact that a minor is depicted nude, on its own, is not enough for that visual depiction to qualify as a lascivious exhibition. Instead, you must determine whether the visual depiction is lascivious based on its overall content. In deciding whether a visual depiction is a lascivious exhibition, you may consider these factors:
> One, whether the focal point of the visual depiction is on the minor's genitalia or pubic area;
> Two, whether the setting of the depiction appears to be sexually inviting or suggestive, for example, in a location or in a pose associated with sexual activity;
> Three, whether the minor appears to be displayed in an unnatural pose or in inappropriate attire; whether the minor is partially clothed or nude;
> Four, whether the depiction appears to convey sexual coyness or an apparent willingness to engage in sexual activity; or
> Whether the depiction appears to have been designed to elicit a sexual response in the viewer.
> This list is not exhaustive, and an image need not satisfy any single factor to be determined a lascivious exhibition. Instead, these factors are meant to guide you in determining whether the depiction is a lascivious exhibition of the genitalia or pubic area as you consider the overall content of the material. It is for you to decide the weight or lack of weight to be given to any of these factors.

The jury convicted Torres on all four counts. He received concurrent sentences: five years for the physical sexual abuse, ten each for the child pornography possession and distribution counts, and twenty-one years for the production of child pornography.

## II.

Torres contends that his conviction for production of child pornography in violation of 18 U.S.C. § 2251(a) was invalid for want of sufficient evidence from which the jury could conclude that he used or induced J.A. to engage in sexually explicit conduct "for the purpose of" taking the photos, as Section 2251(a) requires. Because we hold that the jury could reasonably find the requisite purpose based on the evidence before it, we affirm the child pornography conviction.

A defendant seeking to overturn a conviction for lack of sufficient evidence faces a "heavy burden." *United States v. Borda*, 848 F.3d 1044, 1053 (D.C. Cir. 2017) (quoting *United States v. Branham*, 97 F.3d 835, 853 (6th Cir. 1996)). "We review sufficiency-of-the-evidence claims 'in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence,'" and we give "'full play'" to the jury's prerogative "'to determine credibility, weigh the

---

3/10/16 Tr. 97-98. The district court's instruction incorporated the so-called *Dost* factors, *see United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), which courts have used to guide juries in identifying "lascivious" exhibitions. *See, e.g.*, *United States v. Rivera*, 546 F.3d 245, 249 (2d Cir. 2008). This court has not yet had occasion to consider the *Dost* factors, or any other potential means of defining "lascivious." Nor do we here. Torres did not object to the district court's lasciviousness instruction, and he does not dispute on appeal that the photos of J.A. were lascivious.

evidence and draw justifiable inferences of fact.'" *United States v. Vega*, 826 F.3d 514, 522 (D.C. Cir. 2016) (quoting *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005)). By thus asking only whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," our deferential review "impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal quotation marks omitted).

The jury convicted Torres of producing child pornography under 18 U.S.C. § 2251(a), which applies to "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." The statute enumerates the acts that may constitute "sexually explicit conduct," which include "lascivious exhibition of the genitals." *Id.* § 2256(2)(A)(v). There is no dispute that the jury could reasonably have concluded that Torres "produced" images of J.A. exhibiting his genitals in a "lascivious" manner. The sole question before us is whether the jury had enough evidence from which to conclude that it was "for the purpose of producing" at least one of the photos that Torres used, induced, or coerced J.A. to lasciviously exhibit his genitals. *Id.* § 2251(a). We conclude that the evidence sufficed.

The jury here found that Torres's relevant conduct was "motivated by the intent of producing child pornography." 3/10/16 Tr. 99. Because direct evidence of mental state (such as a defendant's admission as to what he was thinking) is rare, juries routinely determine intent from indirect, or "circumstantial," evidence. *See Vega*, 826 F.3d at 523. Such indirect evidence might include a defendant's conduct before, during, or after the charged criminal acts, or the facts and

circumstances known to him when he acted. *See generally United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008). Circumstantial evidence of "purpose" as Section 2251(a) uses the term might include, for example, a defendant's "specific instructions regarding certain positions [the defendant] wanted [the minor] to assume relative to the camera," *United States v. Morales-De Jesús*, 372 F.3d 6, 21 (1st Cir. 2004); *see United States v. Sirois*, 87 F.3d 34, 42 (2d Cir. 1996) (defendant "directed the participants to move their sexual activity to different parts of the lean-to, so that he could more easily videotape them"), or the minor's otherwise adopting "sexually explicit poses" across multiple pictures, *United States v. Ortiz-Graulau*, 526 F.3d 16, 19 (1st Cir. 2008). Our sufficiency review considers "all evidence—direct or circumstantial," *Vega*, 826 F.3d at 523, and allows the jury latitude "to draw reasonable inferences from basic facts to ultimate facts," *Jackson*, 443 U.S. at 319.

Whatever form it takes, however, evidence of purpose is essential. Not every picture of a child whose genitals are visible establishes a violation of Section 2251(a); there must be proof that the defendant used, induced, or otherwise caused sexually explicit conduct by the minor for the purpose of producing images of that conduct. We do not believe—so do not hold—that "the 'purpose' element of § 2251 is proven by the mere fact that the Defendant personally took a photo of . . . a minor engaging sexually explicit conduct," *United States v. Fifer*, 188 F. Supp. 3d 810, 819-20 (C.D. Ill. 2015). We also have no cause to decide how prominent the purpose to create an image must be among a defendant's possible motives. Rather, we assume—as the dissent argues and the government is willing to concede for the purposes of this appeal—that the government must show that the purpose of producing a visual image was a defendant's dominant motive for using, inducing, or coercing a minor's sexual conduct. Even under that

standard, we find the evidence sufficient to sustain the jury's verdict in this case.

The jury's strongest basis for inferring Torres's "purpose" was what the testimony described and the photos showed about the manner in which Torres used J.A. to lasciviously display his genitals. Most important, one photo shows Torres's hand tilting J.A.'s penis toward the camera, apparently ensuring that it was prominent and depicted from a particular angle in the resulting photo. Having seen the photo, a reasonable juror could accept the government's characterization, in its closing argument, that it was a "trophy picture" of a lasciviously posed J.A.—"[a] good picture, focused on [J.A.'s] penis, that [Torres] could save onto his phone" to view and show later. 3/10/16 Tr. 113. Such firsthand evidence that Torres manipulated J.A.'s erect penis so that the photo would accentuate it supported the jury's conclusion that Torres's reason for having J.A. lasciviously exhibit his penis was to take photographs. *See Ortiz-Graulau*, 526 F.3d at 19; *Morales-De Jesús*, 372 F.3d at 21.

Reinforcing that conclusion, the composition of all four photos—with J.A. lying back on the bed, while Torres stood over him and zeroed in to frame images featuring J.A.'s exposed genitals—had the effect of ensuring that J.A.'s penis was the focal point of each photograph. Torres's positioning himself near J.A.'s knees at the edge of the bed, and taking a progression of four photos that centrally feature J.A.'s naked body and make prominent his erection, suggests that creating the sexually explicit scene and photographing it was a purposeful undertaking on Torres's part, distinct from his sexual intercourse with J.A.

Torres's interaction with J.A. about the photos also reinforces the jury's inference that Torres employed J.A. for

the purpose of producing the photos. Evidence that a defendant lied to a minor about documenting a sexual encounter, or recorded images surreptitiously, bolsters an inference of the requisite purpose. *See Morales-De Jesús*, 372 F.3d at 21. The jury here heard that, even though J.A. did not want Torres to take the photos and right away asked Torres to delete them, Torres responded with a lie, claiming he already did so. 3/9/16 Tr. 104. The jury thus could infer from Torres's dishonesty in keeping the photos over J.A.'s opposition that obtaining the sexually explicit images was itself important to Torres—not merely incidental to the immediate gratification he derived from J.A.'s conduct. *Cf. United States v. Palomino-Coronado*, 805 F.3d 127, 132 (4th Cir. 2015) (finding insufficient evidence of purpose in part because the defendant deleted the only photo he took, of himself and his minor victim having intercourse). If the photos were only incidental to the sexual conduct, by contrast, Torres might have acceded to J.A.'s request. Finally, the jury could treat the fact that Torres later posted one of the photos to Facebook as circumstantial evidence of his purpose. Threatened or actual distribution of a pornographic image by a defendant after the fact, whether for profit or blackmail or merely to spite and humiliate the subject, can support an inference that the defendant had such instrumental uses in mind when he set about creating that image. The jury could thus reasonably infer that Torres's purpose in inducing J.A. to exhibit his genitals on the bed was to create and later use a lasting image of J.A. In sum, the evidence supports the inference that Torres used J.A., inducing him to lie back on the bed, naked and with his genitals lasciviously displayed, for the purpose of obtaining a pornographic image. So, in light of the deference we owe to the jury's conclusions, we accept its verdict that the government proved Torres possessed the requisite purpose.

Torres counters that the government's argument is "circular": "[I]t argues that we know that the sexually explicit conduct was for the purpose of taking a photograph because a photograph was taken of the sexually explicit conduct." Reply Br. 2-3; *see also* Dissent at 11. He faults the government for "failing to imagine a purpose other than photography for observing the genitalia of others," and points out that the goal of the exhibition could have been simply "'to excite lustfulness or stimulation in [himself as] the viewer'" at the time of the encounter. *Id.* at 3 (quoting *United States v. Russell*, 662 F.3d 831, 834-35 (7th Cir. 2011)). But even if Torres's conduct is susceptible of multiple interpretations, the evidence supports the jury's finding of purpose. As already noted, we need not and do not embrace a strict liability rule; there is evidence other than the mere fact of the photographs from which to infer Torres's purpose.

Torres analogizes himself to the defendant in *Palomino-Coronado*, in which the Fourth Circuit held that there was insufficient evidence of purpose to support a conviction under Section 2251(a) for a defendant who took and deleted a single cell phone picture of his sexual intercourse with a child. 805 F.3d at 132. That case is not binding on this court, and we need not opine on its correctness, because the primary concern identified by the Fourth Circuit in *Palomino-Coronado*—to avoid "turning § 2251(a) into a strict liability offense," *id.*—is absent on this evidentiary record. In *Palomino-Coronado*, the defendant and a minor had sex on several occasions, during one of which the defendant used his phone to take a picture of his penetration of the child. *Id.* at 129, 132. Sometime thereafter, he deleted the photo, which resurfaced only once police scoured the phone's memory. *Id.* at 129, 132 & n.4. There was no testimony or other evidence concerning the circumstances under which the photo was created. *See id.* at 132. The Fourth Circuit held that the deleted photo, standing alone, was "not

evidence that [the defendant] engaged in sexual activity with [the minor] *to* take a picture, only that he engaged in sexual activity with [the minor] *and* took a picture." *Id.* It thus reversed the child-pornography-production conviction, to avoid "conflat[ing] the voluntary act of taking the picture with the specific intent required under the statute," *id.* at 133.

The jury here, in contrast, had evidence of specific purpose. The Fourth Circuit saw no evidence that Palomino-Coronado "gave any instruction or direction" to the minor regarding posing for a picture, such as "would indicate purpose," *id.* at 132, whereas in one of the photos here, Torres can be seen holding J.A.'s penis toward the camera to better display it. The context and nature of the pose evinces Torres's purpose to produce a pornographic photograph. And, whereas Torres took multiple photos, lied to J.A. about keeping them, and later shared one on social media, the Fourth Circuit found it "significant . . . that only one photograph was taken and subsequently deleted." *Id.* Our conclusion thus neither conflicts with *Palomino-Coronado* nor converts Section 2251(a) into a strict liability statute.

Notwithstanding the evidence that Torres had the requisite purpose to take a pornographic picture when he induced J.A. to exhibit his genitals for the camera, Torres argues, and the dissent agrees, that we should treat everything that happened in the bedroom that evening as a single "encounter" motivated by sex—not photography. Appellant's Br. 3, 22; Oral Argument Tr. 4-5; Dissent at 8-9. In essence, Torres contends that Section 2251(a) "outlaws the production of child pornography, not child sexual abuse," which District of Columbia criminal law independently bars. Reply Br. 2. Torres accordingly contends that, if anything, the government's evidence depicted him exclusively as a sexual abuser, not a pornographer. By thus reframing the issue, Torres would have us ascribe a single,

common purpose (or set of purposes) to *all* of Torres's sexually explicit uses of J.A.

But Section 2251(a) does not direct any such one-purpose-per-encounter analysis, and Torres does not cite any decisions interpreting the statute to require that approach. The statute required the jury to determine whether Torres's purpose in inducing J.A. to engage in "any sexually explicit conduct" was to produce images "of such conduct." 18 U.S.C. § 2251(a). The jury needed to find only that "at least some of" J.A.'s sexual conduct had the requisite purpose, not all of it. *Ortiz-Graulau*, 526 F.3d at 19. In other words, if the facts construed most favorably to the government include Torres using or inducing an instance of sexually explicit conduct with a purpose to photograph the conduct, that suffices.

Forbidding juries to identify distinct purposes for different instances of sexually explicit conduct would have anomalous results. It would presumably require juries to treat a defendant's multiple uses of a minor for "sexually explicit conduct" as animated by only those purposes that could be ascribed to the encounter as a whole. Thus, simply removing a minor's clothes and photographing a resulting lascivious exhibition would almost invariably violate Section 2251(a). But doing the same before or after also having sex with the minor might not, because in such a case a jury could find the entire encounter's overriding purpose was immediate sexual gratification.

Any analysis that required the defendant's purpose (or purposes) to span all of the conduct the defendant induced within a single encounter would also require us to arrive at some statutorily unspecified definition of an encounter. Here, all of the sexually explicit conduct in the record occurred in fairly quick succession. But what if it occurred at different

times throughout an afternoon? Or in a course of conduct lasting several days or a weekend? Or even within an ongoing "'marital-like' relationship"? *See Ortiz-Graulau*, 526 F.3d at 18. The statute provides no guidance as to how or whether, if we accepted Torres's argument, we might discern one or multiple encounters in such cases; it speaks only in terms of sexually explicit conduct, not encounters. An "encounter" is a unit of analysis the statute does not appear to contemplate, much less define.

The statute as correctly understood, then, supports Torres's conviction even though he had motivations in addition to a purpose to make child pornography when he set about coercing J.A. to engage in various sexually explicit conduct that afternoon. The jury could reasonably have concluded that, in addition to inducing J.A. to have anal sex with him, Torres also used or induced J.A. to engage in another instance of sexual conduct within the meaning of the statute—lasciviously exhibiting his penis—and that he did so for the purpose of taking a picture of that conduct.

Our dissenting colleague finds support for Torres's undivided-purpose theory in *Mortensen v. United States*, 322 U.S. 369 (1944), a case interpreting the Mann Act, 18 U.S.C. § 2421(a). As originally enacted, the Mann Act prohibited interstate transport of women or girls "for the purpose of" prostitution. Pub. L. No. 61-277, § 2, 36 Stat. 825 (1910). The dissent concludes that the Supreme Court's interpretation of that purpose requirement in *Mortensen* should govern our understanding of Section 2251(a), which criminally prohibits inducing certain activity "for the purpose of" producing child pornography. *See Merrill, Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 541 U.S. 71, 85-86 (2006). Crucial differences between the two contexts dissuade us from treating *Mortensen* as controlling here.

The Court in *Mortensen* found the Mann Act's "purpose" requirement unmet in the case of defendants there, Nebraska-based brothel operators who invited two of the brothel's prostitutes to accompany them to sightsee on a round trip to Salt Lake City. 322 U.S. at 372, 374. The two "girls" resumed their sex work upon returning to Nebraska, but the Court held that the uniform purpose of the group's travel "from beginning to end" was "innocent recreation" "entirely disassociated" from prostitution. *Id.* at 375.

The *Mortensen* Court thought it impermissible on the evidence before the jury "to infer that this interstate vacation trip, or any part of it, was undertaken by petitioners for the purpose of, or as a means of effecting or facilitating," prostitution. *Id.* at 374-75. The point of the Mann Act's purpose requirement, *Mortensen* held, was to prohibit "the use of interstate commerce as a calculated means for effectuating sexual immorality," and an "interstate trip taken for an innocent vacation purpose" simply did not meet the requirement. *Id*. at 374. In so holding, the Court noted the absence of any "evidence of any change in the purpose of the trip during its course," so rejected an "arbitrary splitting of the round trip into two parts," which might have allowed an inference that the outbound leg had an innocent purpose whereas the return leg was for the illegal purpose of sending the women back into prostitution. *Id.* at 375-76. Torres would have us analyze his entire course of conduct in a similarly undivided manner, which in his view would compel a finding that he induced all of J.A.'s sexually explicit conduct, including the exhibition of J.A.'s genitals, for the purpose of having sex and not for the purpose of taking pictures.

Section 2251(a), however, calls for a different approach. It is doubtful that Congress intended a modern ban on "employ[ing], us[ing], persuad[ing], induc[ing], entic[ing], or

coerc[ing] any minor to engage in . . . any sexually explicit conduct" to be interpreted in lockstep with the Mann Act's early-Twentieth-Century prohibition on "knowingly transport[ing] . . . in interstate commerce," 36 Stat. at 825. The Mann Act aimed "primarily to eliminate . . . business which uses interstate and foreign commerce as a means of procuring and distributing its victims," 322 U.S. at 377, and the Court in *Mortensen* expressed concern that its decision not "le[ad] the federal government into areas of regulation not originally contemplated by Congress," *id.* at 376. The Court thus refused to subdivide a round-trip "interstate vacation" that began and ended in Nebraska, *id.* at 375, during which "[n]o acts of prostitution or other immorality occurred," *id.* at 372, so as to bring it within the ambit the statute. That may have been good reason to avoid a capacious interpretation of the Mann Act's jurisdiction-conferring interstate transport requirement, especially when to hold otherwise would have allowed "artificial and unrealistic" hairsplitting to render the otherwise-benign conduct at issue—crossing state lines—criminal. *Id.* at 376. But "Congress uses substantive and jurisdictional elements for different reasons and does not expect them to receive identical treatment." *Torres v. Lynch*, 136 S. Ct. 1619, 1630 (2016).

The sexually explicit conduct at issue here is neither harmless nor jurisdictional; it is at the core of Congress's concern. We are dealing not with interstate travel—the jurisdictional hook is elsewhere in this statute—but with Torres's various inducements of the minor J.A. to engage in the sexually explicit conduct, some of which had the distinct purpose of enabling Torres to create child-pornographic images. There is no reason to doubt Congress intended to criminalize that conduct. When amending Section 2251 in 1996, Congress found that "the use of children in the production of sexually explicit material . . . is a form of sexual

abuse which can result in physical or psychological harm, or both, to the children involved" and that "the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children." Child Pornography Prevention Act of 1996, Pub L. No. 104-208, § 121(1)(1), (1)(11)(A), 110 Stat. 3009-26 to -27 (1996). Congress in Section 2251(a) proscribed any and all instances of a defendant's use of a child to engage in sexually explicit conduct with the requisite purpose to photograph. Our best reading of Section 2251 is that Congress intended it to prohibit Torres's conduct here.

In sum, any action by Torres to "employ[], use[], persuade[], induce[], entice[], or coerce[]" J.A. to lie on the bed and lasciviously display his genitals for the camera was prohibited by Section 2251(a), so long as Torres's purpose in doing so was to produce an image of that display. The evidence permitted a jury to infer that purpose here. We therefore affirm Torres's child pornography conviction.

## III.

Torres also contends that his conviction of sexually abusing a minor should be overturned because J.A. gave the crucial testimony—that Torres had anal sex with him—in response to a leading question. Because we conclude that the district court acted within its discretion in allowing the question, we affirm that conviction as well.

We review for abuse of discretion a court's decision to permit a leading question, assuming a timely objection was made to the question. *See Green v. United States*, 348 F.2d 340, 341 (D.C. Cir. 1965). Absent a timely objection, we would review only for plain error. *See United States v. McGill*, 815 F.3d 846, 874, 877 (D.C. Cir. 2016); *United States v. Durham*, 645 F.3d 883, 890 (7th Cir. 2011). We likewise

review for abuse of discretion the denial of a motion for a mistrial. *See United States v. Crews*, 856 F.3d 91, 96 (D.C. Cir. 2017). Here we assume without deciding that Torres timely objected to the leading question, and ask whether the district court abused its discretion in permitting the somewhat leading form of one of the government's questions about the anal sex, and in denying a motion for a mistrial grounded on such witness-leading. In considering whether it was an abuse of discretion to permit a leading question, we bear in mind that the district court, observing the proceedings live, is better positioned than we are to "determine the emotional condition and forthrightness of the witness." *United States v. Johnson*, 519 F.3d 816, 822 (8th Cir. 2008) (quoting *United States v. Nambo-Barajas*, 338 F.3d 956, 962 (8th Cir. 2003)); *accord Shaffer v. United States*, 24 App. D.C. 417, 427 (D.C. Cir. 1904).

Torres argues that the government impermissibly led J.A. when it asked, "[D]id your penis go inside of [Torres]'s butt?" 3/9/16 Tr. 112; *see* Appellant's Br. 23-27. That purported error warrants a new trial, he contends, because the challenged question resolved the "ultimate issue" of the sexual abuse charge. *Id.* at 23. We assume that the challenged question was in fact "leading" within the meaning of Federal Rule of Evidence 611(c), which directs that such questions "should not be used on direct examination, except as necessary." Even so, the district court acted within its discretion in allowing the government's questioning of J.A. about the anal-genital contact to proceed as it did.

The sole leading question challenged here clarified J.A.'s preceding testimony, in which—in response to non-leading questions—J.A. said that Torres touched (as J.A. put it) "[m]y penis" with "[h]is butt." 3/9/16 Tr. 111-12. Only with those facts established did the government then follow up, using

J.A.'s own terminology, to clarify whether J.A.'s penis went "inside of" Torres's butt. *Id.* at 112. Such arguably leading follow-up questions may sometimes be "necessary to clarify testimony . . . and to establish the precise physiological details of sexual assault." *United States v. Wright*, 540 F.3d 833, 845 (8th Cir. 2008) (internal quotation marks omitted).

The topic was highly sensitive and potentially embarrassing, and J.A. was a particularly reserved witness. J.A.'s mother testified that J.A. was characteristically "shy" and "quiet" in his everyday life, 3/8/16 Tr. 65, and throughout his testimony nearly all of his answers, even on benign topics, were terse—one sentence or, often, only a single word. *See, e.g.*, 3/9/16 Tr. 70-71. As the prosecutor began to ask J.A. about the sexual assault itself, J.A.'s reticence increased. For example, a few exchanges before she asked the disputed leading question, the prosecutor asked J.A. to describe "the very next thing that [Torres] did" after removing J.A.'s clothes, but J.A. managed "[n]o response," prompting a ten-minute recess to allow him to compose himself. 3/9/16 Tr. 109-10. Immediately before the challenged question, the prosecutor asked J.A. three times what he meant by Torres's "back part" before J.A. finally answered: "his butt." 3/9/16 Tr. 112. In other words, the record makes clear that J.A. was an unusually "hesitant" witness, and that more open-ended questioning had yielded "lengthy delays" and fragmentary responses. *United States v. Farlee*, 757 F.3d 810, 822 (8th Cir. 2014). The principle we have recognized that a "reluctant" witness may sometimes justify carefully confined leading questions thus readily applies here. *See Green*, 348 F.2d at 341; *see also Young v. United States*, 214 F.2d 232, 237 n.4 (D.C. Cir. 1954); *Mulinelli-Navas*, 111 F.3d at 990.

The context of the challenged question, its sensitive subject matter, and J.A.'s demeanor gave the district court

discretion to allow the prosecutor to ask it.  The district court had the benefit of assessing J.A.'s comportment and prior testimony firsthand.  We thus see no cause here to disturb its conclusion that the form of the question was "necessary."  Fed. R. Evid. 611(c).

Torres's contention that the challenged question concerned an "ultimate issue" does not change our conclusion.  For starters, the question here did not address an "ultimate issue" in the traditional sense, such as might supply an independent basis to forbid it; J.A. was not asked, for instance, "Did Torres sexually abuse you?" or, for that matter, "Did Torres have the purpose of producing an image of you?"  *See* Fed. R. Evid. 704(b); 1 *McCormick on Evidence* § 12 (7th ed. 2016).  The question established a fact essential to the conviction, but the pivotal importance of the question was cause for the district court to exercise its discretion with special care, and to require the prosecution to proceed with restraint; it was not reason to deprive the government altogether of the benefit of a limited prompt of the witness that was otherwise appropriate in the circumstances.

One final matter:  Torres also argues that J.A.'s age when he testified—eighteen—should have precluded the government from asking the question in a leading form.  Appellant's Br. 26.  He notes that the district court characterized eighteen-year-old J.A. as "under age," and argues that the ostensible error of treating him as "a child witness" requires reversal.  *Id.*; *see* 3/9/16 Tr. 113.  But the district court also noted the sensitive subject matter and emphasized that the government previously had "been basically unable to get particular answers."  3/9/16 Tr. 113.  We need not, and do not, rely on J.A.'s age—whether while testifying or at the time of the underlying events—to hold that the district court permissibly exercised its discretion to allow the government to question J.A. as it did.  While the age

and maturity of younger witnesses is relevant to whether a leading question is permissible, there is no basis—in Rule 611(c) or elsewhere—for a categorical rule that eighteen-year-olds may never be asked leading questions.

Because the district court acted within its discretion in allowing the limited form of leading question that Torres challenges, there was no abuse of discretion in overruling Torres's objection or denying his motion for a mistrial.

* * *

For the foregoing reasons, we hold that the jury heard sufficient evidence to convict Torres of producing child pornography in violation of 18 U.S.C. § 2251(a), and that the district court did not abuse its discretion in allowing a leading question of J.A. as he described Torres's acts that amounted to sexual abuse of a minor under D.C. Code § 22-3009.01. We thus affirm both convictions.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring in part and dissenting in part: 18 U.S.C. § 2251(a) imposes criminal liability on "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct. . . ." Sexually explicit conduct is defined elsewhere in the statute as "actual or simulated—(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2). If we insert the "lascivious exhibition" language in lieu of the more general term, we have guilt for any person

> who . . . entices . . . any minor to engage in . . . any sexually explicit conduct [lascivious exhibition of the genitals or pubic area of any person] with the purpose of producing any visual depiction of such conduct . . . .

18 U.S.C. §§ 2251(a); 2256(2).

We review the sufficiency of the evidence *de novo*, considering it in the light most favorable to the government, to determine whether a reasonable trier of fact could have found Torres guilty beyond a reasonable doubt of all the required elements of the crime. See *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002). That requires us to explore one particular statutory element: the defendant's intent. The relevant statutes do not proscribe a defendant's photographing a minor with the purpose of creating child pornography, but instead proscribe a defendant's *engaging in sexual conduct for the purpose of creating the pornography*. Because I do not believe the government presented sufficient evidence for a

reasonable juror to draw the latter inference, I respectfully dissent from Part II of the majority's opinion and judgment.

* * *

A requirement that conduct be undertaken "for the purpose of" some aim has a long history in statutes of this kind. It appeared in the original text of the Mann Act, which criminalized transporting across state lines "any woman or girl for the purpose of prostitution or debauchery." Pub. L. No. 61-277, 36 Stat. 825 (1910), *codified as amended at* 18 U.S.C. §§ 2421–2424. Because of the similarity in language, Mann Act jurisprudence is highly relevant when interpreting § 2251. See, e.g., *United States v. Vang*, 128 F.3d 1065, 1069–70 (7th Cir. 1997); *United States v. Kinslow*, 860 F.2d 963, 967 (9th Cir. 1988).

The leading Supreme Court decision interpreting the Mann Act's "for the purpose of" element is *Mortensen v. United States*, 322 U.S. 369 (1944). In that case, the petitioners operated a brothel in Grand Island, Nebraska. After the defendants traveled to visit family in Utah for several days and permitted two of the brothel's sex workers to ride along for a vacation, the petitioners were prosecuted for violating the Mann Act. *Id*. at 372–73. The government argued that because all parties understood and intended that the workers would resume their illicit activities once they returned to Nebraska, the defendants had undertaken at least the return journey "for the purpose of" prostitution. See *id*. at 375.

The Court disagreed, writing:

The statute thus aims to penalize only those who use interstate commerce with a view toward accomplishing the unlawful purposes. To constitute a violation of the Act, it is essential that the interstate

transportation have for its object or be the means of effecting or facilitating the proscribed activities. *Hansen v. Haff*, 291 U.S. 559, 563 [(1934)]. An intention that the women or girls shall engage in the conduct outlawed by [the Act] . . . *must be the dominant motive* of such interstate movement. And the transportation must be *designed* to bring about such result. Without that necessary intention and motivation, immoral conduct during or following the journey is insufficient to subject the transporter to the penalties of the Act.

*Id*. at 374 (emphasis added). "For the purpose of" meant that what Congress had outlawed was "the use of interstate commerce as a *calculated means* for effectuating sexual immorality." *Id*. at 375 (emphasis added).

Our Court has not had occasion to apply *Mortensen*. I note that our sister circuits have generally not taken its admonitions very seriously, writing them off as "dicta." As the Seventh Circuit notes, "many circuits have upheld jury instructions and convictions where an immoral purpose was 'at least one of the purposes motivating the interstate transportation.'" *Vang*, 128 F.3d at 1071 (quoting *United States v. Bennett*, 364 F.2d 77, 78 (4th Cir. 1966) and collecting cases thereafter). The Seventh Circuit concludes that *Mortensen*'s "dominant" requirement "mean[s] merely 'significant' or 'compelling' or 'efficient'" even while recognizing that normally, "'dominant' means 'prevailing over all others.'" *Id*. at 1072. Those courts made no serious effort to reconcile their conclusions with the actual language or holding of *Mortensen*.

I grant that the government does not have to prove that a defendant is "single-minded" in his purpose. See *United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012); *United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996) ("The criminal

law applies to everyone, not just the single-minded. And a person who transports children across state lines both to engage in sexual intercourse with them and to photograph that activity is no less a child pornographer simply because he is also a pedophile."). But insistence that the forbidden purpose have been "the dominant" one does not require single-mindedness—merely genuine predominance. Cases that accept the presence of multiple dominant purposes, unless carefully cabined, depend on an oxymoronic concept, in defiance of *Mortensen*.

*Mortensen* did not—in its language—deal with mixed-motive petitioners, as it simply declared that "[t]he *sole* purpose of the journey from beginning to end was to provide innocent recreation and a holiday for petitioners and the two girls." 322 U.S. at 375 (emphasis added). Of course that purpose could have been perfectly accomplished if the "girls" had remained in Utah and skipped the interstate return journey to Nebraska. The Court's declaration that holidaying was "the *sole* purpose" of the trip must be seen as a slightly hyperbolic way of saying that it meant "the dominant purpose" requirement to be taken very seriously—seriously enough to exclude purposes that would render conduct illegal even if those purposes were obviously quite substantial and indeed sufficient to independently explain the conduct in question.

Even courts that have discarded *Mortensen* halfway and admitted the linguistically awkward notion of "*a* dominant purpose" have insisted that the government show at least that the purpose of producing a visual image played a starring role among the defendant's motives to engage in, or to engage a minor in, sexual conduct. See *United States v. Palomino-Coronado*, 805 F.3d 127, 132 (4th Cir. 2015) (finding insufficient evidence "that Palomino-Coronado engaged in sexual activity with B.H. *to* take a picture, only that he engaged in sexual activity with B.H. *and* took a picture"). The majority's distinction between "substantive" and

"jurisdictional" elements, relying on *Torres v. Lynch*, 136 S.Ct. 1619, 1630–31 (2016), seems to me to be clever but unavailing. See *slip op.* 19. The Court's point in the cited section was that jurisdictional elements *could*, if Congress so chose, have a *lower* mens rea requirement—or no mens rea requirement at all—compared to a substantive element. *Id.* It does not excuse the government from meeting a *high* mens rea requirement where a statute attaches one, either to a jurisdictional element (as in the Mann Act) or to a substantive one (as in § 2251(a)).

The government argues that intent is not a burdensome element to meet because § 2256 includes as a minimal definition of "sexual conduct" the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2). The government contends that it need not make any showing as to the purpose of the sexual intercourse between Torres and J.A.; the lascivious exhibition captured in the photographs "by its nature lends itself to the production of a visual image." Appellee's Br. 17. Once the photo is taken, the dominant "purpose" of the scene is self-evident.

There are two problems with the government's interpretation of §§ 2251 and 2256. The first is that it risks an interpretation effectively eliminating § 2251's requirement that sexual conduct be "for the purpose of" producing child pornography. On the government's reading, any picture-snapping during an assembly of two or more people (including at least one minor) that displays someone's pubic region (note that § 2256 does not limit itself to the exhibition of only the minor's body) gives the anterior "exhibition" the object of producing pornography merely because of what is in the image. Under *Vang*, discussed above, courts in the Seventh Circuit have adopted precisely this approach, in one case excluding evidence that the defendant and victim were in an ongoing, consensual sexual relationship as *irrelevant* to the purpose of the sexual conduct. See *United States v. Fifer*, Cr. No. 14-

30006, 2015 WL 7004995 (C.D. Ill. Nov. 10, 2015). In *Fifer*, the court reasoned that under *Vang*'s watered-down reading of *Mortensen*, "the 'purpose' element of § 2251 is proven by the mere fact that the Defendant personally took a photo of, took a recording of, or engaged in the recorded act along with a minor engaging sexually explicit conduct." *Fifer*, 188 F.Supp.3d 810, 819–20 (C.D. Ill. 2016).

Congress very well could have criminalized the conscious production of child pornography, but it did not, at least not in § 2251(a). Instead, § 2251 imposes severe penalties (currently a mandatory minimum of 15 years imprisonment) on sexual activity with a minor that has as its purpose the production of child pornography. The majority rightly notes Congress's sentiment that involving children in the production of sexually explicit material is a form of sexual abuse, but the majority does not pause to note that actual physical abuse in this case resulted in only a five-year sentence while production of child pornography carried a mandatory minimum of fifteen years and garnered Torres a twenty-one year sentence. Surely the lengthy mandatory minimum (and of course even lengthier maximum of thirty years) are indications that Congress meant that, to be guilty, a defendant must be found to have given his photographic purpose the highest priority.

The tension between the government's reading of § 2251 and its penalties is underscored by its acknowledgement at oral argument that its interpretation imposes criminal liability on two just-underage teens who engage in sexual intercourse and incidentally take a picture of themselves doing so on their smartphones.[1] Indeed the government's view would cover an

---

[1] After all, 18 U.S.C. § 2251 imposes criminal liability on "[a]ny person"—thus including minors—who engage in sexual conduct with minors for the purpose of producing a depiction of that conduct. And where minors—defined as under the age of 18—are among the

even more startling case—a married couple's taking such a picture if at least one of the spouses were under 18. See *United States v. Ortiz-Graulau*, 526 F.3d 16, 19 (1st Cir. 2008). The government's only assurance that teenagers in a consensual— or even married—relationship would not be subjected to fifteen-year sentences is based on a claim that "purpose" becomes more complicated and difficult to prove in relations of mutual affection where pleasure and satisfaction predominate. But surely pleasure and satisfaction can be the dominant motive for predators no less than for lovers—however horribly one-sided. And in any event, that showing of complicated motive would be foreclosed by the government's reading of § 2251, which treats the "visual depiction" itself as adequate evidence that the defendant brought about the "lascivious exhibition" for the photographic purpose.

The second problem with the government's position is that, at least in this case, it performs the kind of disaggregation the Supreme Court disallowed in *Mortensen*. J.A.'s testimony supports finding that Torres committed two acts of sexual assault on J.A. in the course of a single evening encounter. But rather than focus on either of those acts or both together, the government seeks to isolate a third instance—the moment the photograph was snapped—as the sole aspect of sexual conduct for which it must demonstrate specific intent. The Supreme Court rejected a similar move when the government argued in *Mortensen* that at least the *return* trip to the brothel evidenced a purpose to cross state lines for prostitution. The Court countered that

perpetrators, prosecutors wield broad discretion between use of conventional criminal charges and less draconian modes of enforcement. See 18 U.S.C. §§ 5031–42.

> The fact that the two girls actually resumed their immoral practices after their return to Grand Island does not, standing alone, operate to inject a retroactive illegal purpose into the return trip to Grand Island. Nor does it justify an arbitrary splitting of the round trip into two parts so as to permit an inference that the purpose of the drive to Salt Lake City was innocent while the purpose of the homeward journey to Grand Island was criminal. The return journey under the circumstances of this case cannot be considered apart from its integral relation with the innocent round trip as a whole.

*Mortensen*, 322 U.S. at 375. Of course, there is nothing innocent about Torres's conduct surrounding the moment of the photography, but the point remains the same. Torres has been appropriately prosecuted, convicted, and sentenced for his sexual assault of J.A. For the government to reconcile its charge of engaging in sexual activity for the purpose of producing child pornography with *Mortensen*, it must either show that the overall purpose of the actual assault(s) was the production of the depiction, or that there was a conscious, emphatic break or shift in activity such that the "lascivious" appearance of J.A. represented conduct of Torres having the specific purpose of producing child pornography and was not just an incidental component of the sexual conduct.

Even in circuits that find in *Mortensen* only a slight burden on the government, courts have (rightly, in my view) recognized that the government must show either direct or significant circumstantial evidence of intent beyond the depiction itself to meet its burden under § 2251. Thus courts have upheld convictions in reliance on evidence that the defendant sent the victim money for a webcam and requested recordings, *United States v. Pierson*, 544 F.3d 933, 936 (8th Cir. 2008); that the defendant requested specific poses and a

specific number of images, *United States v. Lee*, 603 F.3d 904, 918 (11th Cir. 2010); that the defendant broke off the encounter to retrieve recording materials from his car, dissembled about the video recording to the victim, and directed the victim how to pose and what to say on the recording, *United States v. Morales-de Jesús*, 372 F.3d 6, 21–22; and that defendant transported photography equipment through a window and chose a location for its suitability for photography, *Lebowitz*, 676 F.3d at 1013.  None of these circumstances is remotely present here—where events were driven by the ubiquity of the smartphone.

In this case, the government concedes it cannot show that the purpose of the overall encounter between Torres and J.A. was the production of the photographs.  Appellee's Br. 16.  It also has not produced sufficient evidence that the exhibition of J.A. was a purposeful, severable encounter such that a reasonable juror could find that Torres's activities were driven by the purpose of producing child pornography.

\* \* \*

The government's purported evidence of purpose ranges in probative effect between slight and nil.  A forensic expert testified that metadata on the images showed conclusively that the four explicit photographs were taken on April 9, 2014.  Trial Tr. 2:6–7, 2:56–57.  But the expert was not asked and did not testify as to the specific time the images were created or the amount of time that elapsed while the photographs were taken.  To the question posed to J.A., "What happened first?"  the prosecutor received no answer after the defendant objected.  Trial Tr. 113–15.  Because it offered no evidence of the sequence or timing of events, the government cannot even claim that a conscious break preceded the photo-taking.

The government argues that we can infer a conscious break to prepare and facilitate the photography because J.A. testified that Torres was clothed when the images were taken, but would have been unclothed for the anal contact. Appellee's Br. 17. But that inference could only be drawn if there were evidence the photography came after the anal contact, or that Torres was significantly unclothed during the contact, neither of which was established at trial. No evidence on sequence was offered, and the government's theory on sequence apparently shifted during the trial. Trial Tr. 1:197–98 (government's opening statement). Indeed, after the close of J.A.'s testimony, the court expressed itself perplexed during a bench conference about the course of events in the government's narrative. Trial Tr. 3:123 ("THE COURT: Assaultive conduct is beginning and after? I thought the pictures came after both. I don't remember whether—"). The sum of this evidence (the only circumstantial evidence offered by the government other than the pictures themselves) could support no reasonable inference even as to the sequence or duration of the photography within the course of events, much less that the sexual conduct (even defined as "lascivious exhibition") was *for the purpose of* the photography.

Furthermore, our colleagues in the Fourth Circuit were surely correct in saying that a defendant's "use of his cell phone to take pictures is a far cry from the tripod and other recording equipment used to support purpose in other cases." *Palomino-Coronado*, 805 F.3d at 133 (citing *Lebowitz*, 676 F.3d at 1013; *Morales-de Jesús*, 372 F.3d at 22). While a predator certainly could use a smartphone to violate § 2251, more circumstantial evidence of purpose is required than the government elicited in this case. Without some indication that Torres assaulted J.A. for the purpose of taking a picture of the assault, or that the participants made a clearcut shift in their activities from the overall sexual encounter, no trier of fact could reasonably find the intent element of § 2251 satisfied.

The majority repeatedly asserts that its interpretation does not impose "strict liability" for the production of child pornography. Indeed, the only situation that I can think of that would escape the majority's imposition of liability would involve a predator who, after concluding a tryst or an assault, belatedly realizes the sexual conduct may have been captured on his home security surveillance system and recovers the footage. That is, as read by the majority the statute does impose strict liability, except for the freak occurrence of a truly incidental creation of a photo or video. But the real problem with the majority's reading is not that it imposes strict liability (in the "strict" sense of the term), but that it *conflates* two distinct forms of potential liability. The statute, § 2251, pointedly does not criminalize the purposeful taking of a photo, or sexual activity that is photographed; it criminalizes engaging in sex *for the purpose* of taking a photo, a difference that loses its distinction in the majority's interpretation.

The majority notes that § 2251 criminalizes "conduct" rather than an overall "encounter" and apparently puts some weight on the fact that (with § 2256(2)) it specifies particular instances of conduct—such as exhibition—that can be, and in this case were, separately charged. But of course that was true of *Mortensen*, where the government charged the Mortensens just for the return journey of their interstate travel. *Mortensen*, 322 U.S. at 373–73. Although that bifurcation of the travel is highly plausible as a matter of human purposiveness (one's goals in setting out on vacation are quite different from those on return), the Supreme Court made clear that in assessing the defendants' purpose, the return journey could not be "considered apart from its integral relation" to the vacation "as a whole." *Mortensen*, 322 U.S. at 375. I believe we should respect that guidance.

Even courts indulging in halfway rejection of *Mortensen*, demanding only "a" dominant purpose of producing child

pornography, have commonly looked to the predatory sexual relationship as a whole. In *Sirois*, a teacher and his then-adult student preyed on three underage boys—some of whom they had a prior sexual relationship with—during an interstate camping trip. (In addition to criminalizing engagement in sexual conduct with children, § 2251 also criminalizes the interstate transport of children for the purpose of producing child pornography. 18 U.S.C. § 2251(a).) The Second Circuit, noting that during the videotaping the defendant "was 'telling people what to do' as he recorded the sex," 87 F.3d at 37, found the evidence adequate to meet its rather lax standard of requiring only that "the production of visual depictions of [sexual] activity was one of the dominant motives" for the multi-day camping trip "and not merely an incident of the transportation." *Id*. In *Palomino-Coronado*, as the majority notes, only one photo was taken during the defendant's and victim's sexual activity "over many months." The Fourth Circuit overturned the conviction, stressing that the production of but a single photo "militat[ed] against finding that [the defendant's] intent in doing so [i.e., engaging in a long-running predation] was to take a picture." 805 F.3d at 132.

In other situations courts have looked for a definite and deliberate change in the relationship to show that production of child pornography had become a dominant purpose. In *Morales-de Jesús*, 372 F.3d at 21–22, for instance, the defendant broke off a fourth sexual encounter in an ongoing affair with the minor victim to retrieve and set up recording equipment. In *Lebowitz*, 676 F.3d at 1007, 1013, the defendant and victim, after nine separate sexual encounters in a vehicle, planned a tenth encounter in a bedroom for the preannounced purpose of easier videography. Our case utterly lacks this kind of conscious and deliberate turn in the course of sexual conduct.

The majority is right that courts have inferred the requisite intent in part from defendants' post hoc activities, such as lying

about whether a photo was deleted or posting a photo online. But in my view, post hoc circumstantial evidence, on its own, will almost always be insufficient evidence of intent at the key time—the "sexually explicit conduct." In *Morales-de Jesús*, cited by the majority, the court did indeed consider circumstantial evidence that the defendant lied about deleting images, but there was significantly more circumstantial evidence of the defendant's preparations than here, including the fact that Morales-de Jesús broke off the encounter to retrieve and set up recording equipment and throughout the encounter instructed the victim on how to pose relative to the camera, and carried various sex aids in the same bag as his camera. *United States v. Morales-de Jesús*, 372 F.3d 6, 21–22. The majority also relies on *Palomino-Coronado*, which found significant that the defendant deleted the one obscene image he had taken almost immediately after creating the "lascivious exhibition." But in that case the Fourth Circuit reversed the conviction, not just because of the deletion, but because the record lacked other circumstantial evidence that the defendant's preparation and direction of the "exhibition" was *aimed* at the photography, rather than the photography's being merely to "memorializ[e] [the parties'] time together." 805 F.3d 127, 132–33.

The idea that "distribution" of a photo—in the now pervasive form of Facebook posting—supports an inference of the requisite intent, *slip op.* at 13, seems weak and unsupported. To be sure, in the context of a sentencing review, the Second Circuit has reasoned that distribution of an image "is properly viewed as a further harmful object of, and relevant conduct to, the attempted production crime of conviction" under § 2251(a). *United States v. Broxmeyer*, 699 F.3d 265, 283 (2d Cir. 2012). But in that case the defendant distributed images in order to coax underage girls to produce and send him explicit images in turn—i.e., the defendant used the photographic images to promote further posing, in a steady round of posing and photo

snapping, photo snapping and posing.  I see no justification for our court to so dilute the statutory language to the point where convictions can rest on nothing more than the depiction alone, or a depiction coupled with very slight post hoc circumstantial evidence.

The majority is also concerned with the "anomalous results" of possibly convicting a defendant who removes a victim's clothes and takes photographs, but not a defendant who does that but also assaults the victim.  *Slip op.* at 16.  But it is hardly anomalous that a single act with a single motive would be easier for the government to prove and a jury to discern than mixed actions with a dominant motive and several subordinate ones.  The majority protests that the same act—photography—could be criminalized in one instance but not in another.  But again, Congress could have criminalized the act of photography itself but did not.  It chose to criminalize the act of exploitation *for* photography.  In the scheme of § 2251(a), photography exploiting minors, standing alone, is not to be punished, whereas sexual contacts *aimed at generating* such photography are.  If the criminal consequences are anomalous, that is a result of the statute Congress wrote.

Finally, the majority seems to rest in part on what it believes to be a qualitative difference between the first three images, showing J.A. alone, and the fourth image apparently showing Torres's hand holding J.A.'s genitals, which on the government's theory provides sufficient evidence that Torres "posed" J.A. as a "trophy," indicating that the sexual conduct depicted in the picture was for the dominant purpose of taking the picture.  *Slip op.* at 12.  But it is unclear to me why that should be.  First, the prosecutor's labelling one of the photos "trophy" is fine rhetoric but in fact tells us nothing about the perpetrator's purpose.  Further, the weakness of the argument is shown by how easily it can be turned upside down.  Why could one not say that the pleasure of sexual touching is the

dominant purpose of the "lascivious exhibition" recorded in the fourth image and not of the other three images, which reflect the perpetrator's forgoing the satisfaction of such touching? In this case the government's relying on the depictions in the photographs to establish the defendant's intent means that a guilty verdict has rested on speculation rather than reasonable inference. If a "verdict was based on pure speculation, . . . it cannot stand." *United States v. Lucas*, 67 F.3d 956, 960 (D.C. Cir. 1995) (citing *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990) ("A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation.")). I think whatever difference there may be between the no-hand photographs and the other one is better left to Krafft-Ebing and his followers than to judges or juries charged with applying the criminal law.

In closing I should summarize the panel decision's two layers of deviation from the Supreme Court's *Mortensen* holding (as I read it). First, the statute's requirement that the government prove that the defendant carried on the activity with "*the* purpose of producing" a visual depiction means that the government must establish that purpose as the defendant's *dominant* purpose (singular). Second, in identifying the activity conducted with the forbidden purpose the government cannot disaggregate at will among events that took place as part of a single course of events, any more than in *Mortensen* the government could break the round trip to Utah into "going" and "return," even though they were separated by several days and the government charged only the return trip. Obviously the two are closely related. Only by a disaggregative sleight of hand does the government come within a country mile of proving the forbidden purpose—but even with disaggregation, its case is wanting.

I would overturn Torres's § 2251(a) conviction for insufficient evidence and therefore respectfully dissent. I

concur with the majority on affirming the district court's ruling on the leading questioning.